IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ELAINE L. CHAO, Secretary of Labor,
United States Department of Labor,

                                                    CV. 06-1359-AS

        Plaintiff,

                                                    FINDINGS AND
    v.                                              RECOMMENDATION

LOCAL 290, PLUMBERS
STEAMFITTERS, PIPEFITTERS AND
MARINE FITTERS OF THE UNITED
ASSOCIATION OF JOURNEYMEN
AND APPRENTICES OF THE
PLUMBING AND PIPEFITTING
INDUSTRY OF THE UNITED STATES
AND CANADA,

        Defendants.
_____

ASHMANSKAS, Magistrate Judge:

        Plaintiff Elaine L. Chao, Secretary of Labor ("the Secretary"), brings an action under Title

Findings and Recommendation                1                              {KPR}

IV of the Labor-Management Reporting and Disclosure Act of 1959 ("the Act"), 29 U.S.C. §§ 481–484, against Defendant Union, Local 290, Plumbers, Steamfitters, Pipefitters and Marine Fitters of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada ("the Union").  The Secretary alleges that the Union violated § 401(e) of the Act by failing to mail election notices and ballots to all eligible union members and by permitting ineligible union members to vote.  The Secretary also alleges that the Union used its funds to promote a member's candidacy, in violation of § 401(g) of the Act.

The Secretary moved for summary judgment on all claims and the Union filed a cross-motion for summary judgment on all claims.  For the following reasons, the Secretary's Motion for Summary Judgment is granted.

## FACTUAL BACKGROUND

There is little disagreement between the parties about the facts underlying this case.  The violations alleged by the Secretary arise from an election of union officers held January 3, 2006.  This election was subject to the provisions of Title IV of the Act, the United Association Constitution ("UA Constitution"), and the Constitution and By-Laws of Plumbers, Steamfitters, Pipefitters and Marine Fitters Local 290 of the United Association ("Union Bylaws").

In the weeks leading up to the 2006 election, the Union received a letter faxed from District Council 36.  The letter, signed by the business managers of four local unions, "rescind[ed] the reciprocal 'B List' Hiring Hall agreements in effect with [the Union]."  (Williamson Declaration, Amended Exhibit 1 at 21.)  The letter indicated that the loss in status was a result of Michael Warhurst's conduct and contained strongly disparaging comments about him.  At the time, Mr. Warhurst was also a candidate for the union office of Business Manager/Financial Secretary-

Treasurer ("Business Manager").

According to the Union's own Concise Statement of Material Facts ("CSMF"), after receiving the letter on December 20, 2005, the Union posted the letter "on the inside of a window in the referral office where the members signed the out-of-work list." (Defendants's CSMF at 3.) On December 21, 2005, the Union posted the letter "on the bulletin board in the referral office next to the out-of-work lists." Id. After posting the letter, the Union received calls about the letter and the Dispatcher read the letter and referred callers to other members of the Union's staff. On December 22, 2005, Herman Stonebreaker, a Business Agent for the Union, took the letter to the Ronler Acres and Newberg Hospital job sites and discussed it with union members. Id. Lou Christian, another Business Agent, spoke about the letter at a monthly meeting and at least five job sites. Id at 4. The letter was posted and distributed prior to the election on January 3, 2006, and "at least 260 ballots [that] were postmarked on or after December 21, 2005 were counted in the election." (Plaintiff's CSMF at 4.)

The union held its election of officers on January 3, 2006. Twenty-one members who voted were ineligible to vote because they qualified as "owner members." Owner members are those "members who enter business legitimately for themselves or who hold a financial interest in a business directly connected with the plumbing and pipefitting industry." UA Constitution § 161. The Union's constitution, forbids a member to vote "until one (1) year after the member has terminated his business or financial interest in any business directly connected with the plumbing and pipe fitting industry." Id. An error in the Union office resulted in these members receiving ballots. Conversely, eleven eligible voters were unable to vote because the Union did not have their current addresses and they did not receive ballots. The election results were close; the President was

elected by a margin of six votes and the Business Manager was elected by a margin of twenty-four votes.

Following an election, a union member has five days to file a claim contesting the validity of the election. Union Bylaws, Article IV § 6(b). On January 6, 2006, Michael Warhurst, a union member in good standing, protested the election. He alleged, among other things, that the Union allowed ineligible members to vote in the election and that, shortly before the election, the Union used union funds to circulate a letter that disparaged him. Later, he supplemented his allegations, alleging that the Union failed to properly maintain its mailing list, preventing several eligible members from exercising their right to vote.

On January 8, 2006, Thomas and Linda Nelson, also union members in good standing, lodged their own election protest. In particular, the Nelsons objected to the Union's failure to mail ballots to all eligible voters and the circulation of the letter with disparaging comments about Mr. Warhurst. Both Mr. Warhurst's and the Nelsons' complaints were denied by a representative of the General Secretary on April 17, 2006. (Plaintiff's CSMF at 4.) Complaints were then filed with the Secretary, incorporating the issues raised in the complaints before the Union.

### SUMMARY  JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The materiality of a fact is determined by the substantive law on the issue. T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a

verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Electrical, 809 F.2d at 630.

## DISCUSSION

Section 401 of the Act sets forth the "Terms of office and election procedures." 29 U.S.C. § 481. Pursuant to this section, "[e]ach member in good standing shall be entitled to one vote," and at least "fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address." 29 U.S.C. §481(e). The Act also mandates that "[t]he election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this subchapter." Id. The Act also prohibits a union from using any of its resources "to promote the candidacy of any person in any election subject to the provisions of this subchapter." 29 U.S.C. § 481(g). Finally, violations of the Act are generally remedied by a new election ordered by the court and supervised by the Secretary. 29 U.S.C. § 482(c).

I.    The Union violated the Act by failing to mail election notices and ballots to all members eligible to vote.

A.    The Union failed to take reasonable efforts to maintain its mailing list.

Findings and Recommendation                    5                    {KPR}

Prior to a valid union election, subject to the requirements of the Act, each union member eligible to vote must receive an election notice and a ballot. Section 401(e) of the Act states that "[n]ot less than fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address. Each member in good standing shall be entitled to one vote." 29 U.S.C. § 481(e). This requirement is moderated by a "reasonable efforts" standard. Unlike other circuits, the Ninth Circuit "[does not] agree that a violation of the Act occurs every time a union fails to send a notice to a member who is known to be no longer residing at the address the union possesses and who does not receive mail sent to that location." Reich v. District Lodge 720, 11 F.3d 1496, 1501 (9th Cir. 1993). Rather, the Ninth Circuit held that so long as the Union can "affirmatively show that it has made reasonable efforts to maintain an accurate mailing list" it need not have mailed election notices and ballots to known invalid addresses. Id. at 1502.

The Union bears the burden of proving that it has taken such "reasonable efforts." Id. To determine reasonableness, a court should consider "the facts and circumstances of a particular case," including, but not limited to, "the steps the union initially took to solicit addresses from its members, its means of verifying that the addresses it has are still correct, its method of compiling the mailing list . . . and its process, if any, for deciding when addresses should be removed from the . . . list because mail has been returned as undeliverable." Id.

Here, the Union does an adequate job of updating addresses when it receives notice of a member's address change. First, the Union Bylaws state that "[a]ll members shall notify the Business Manager/Financial Secretary-Treasurer of change of address." (Anderson Declaration, Exhibit 1 at 15.) Second, when the Union finds out that an address is incorrect it deletes the address from the mailing list. Third, when the Union is notified of a forwarding address, it updates the

member's address on the mailing list.  Finally, members often stop in or call to report a new address, at which point the new address is entered into the mailing list.  However, the Union fails to take affirmative steps to maintain the accuracy of its mailing list.  In particular, the Union takes no steps to ascertain a new address when mail is returned as undeliverable.  According to the Union, when mail is returned the "receptionist . . . attempts to call members . . . to obtain a new mailing address." (Def.'s Mot. for Summ. J. at 21.)  However, Union personnel testified that this is not part of any established procedure.  On the contrary, only "in some circumstances [the receptionist] may call" if a letter is returned as undeliverable.  (Gremaux Depo. at 63.)   The procedure for mailing ballots is similarly disappointing. A union staff member stated that, upon realizing an eligible member had not been mailed a ballot, she "would have looked them up to see if there was a valid address, and if there was mailed them one.  And if not, they wouldn't have been mailed one."  (Williamson Decl., Ex. 4 at 5.)  She further testified that no attempt to contact the member would have taken place by phone, email, or dispatch.  Id. at 6.  Another Union staff member testified that beyond removing the address from the mailing list when mail was returned as undeliverable, "there was not any set policy" requiring further steps to update the address.  (Williamson Decl., Ex. 5 at 2-3.)  This represents a failure of the Union to take reasonable efforts to maintain its mailing list as required by § 401(e) of the Act.  29 U.S.C. § 481(e).

The court recognizes that the Union successfully mailed ballots to over ninety-nine percent of its eligible voting membership.  However, it does not excuse the Union from taking reasonable steps to ascertain a correct address for a member whose mail was returned as undeliverable. Whether this effort is successful is of no import to our inquiry.  The law requires that the Union undertake a reasonable effort to update its mailing list.  The Union has failed to meet this

requirement.

II.    Defendant Union mistakenly allowed "owner members" to vote in the election in numbers sufficient to influence the outcome of the election.

A.    Owner members are not eligible to vote in union elections.

A member of the Union "who enters business legitimately for himself, or who holds a financial interest in any business directly connected with the plumbing and pipe fitting industry" is known as an "owner member." UA Constitution § 161. Owner members "shall not have the right to voice or vote or to take any part in the official affairs of the Union until one (1) year after the member has terminated his business or financial interest in any business directly connected with the plumbing and pipe fitting industry." Id. Section 401(e) of the Act states that a union election "shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this subchapter." 29 U.S.C. § 481(e). In other words, the Union is bound by the Act, its constitution, and its bylaws. Therefore, by allowing ineligible members to vote in the election, the Union violated its constitution and the requirements of the Act.

The Union argues that allowing owner members to vote, while contrary to its constitution, was acceptable as a custom under principles of parliamentary procedure. According to the Union, "a custom has the force of a rule until a member challenges the custom, at which time the regular rules are enforced." (Def.'s Mot. for Summ. J. at 30.) Apparently, "owner members" were allowed to vote in the 2002 union election. However, the testimony of union personnel reveals that this was actually an oversight, rather than a custom.

Jerry Moss, a business agent for the Union, testified that he was "aware of the constitutional provision . . . prohibiting [owner members] from . . . voting in officer elections." (Williamson Decl., Ex. 1 at 67.) He also stated that he did not know whether owner members had been allowed to vote

Findings and Recommendation                    8                              {KPR}

in prior elections. Lou Christian, another business agent, testified that he was aware that owner members were ineligible to vote and was not aware that any owner members were voting in the 2002 and 2006 elections. (Williamson Decl., Ex. 2 at 27-28.) He stated that "[his] assumption would have been that owner members didn't vote because they weren't eligible." Id. at 28. Michael Anderson, an assistant business manager, testified that at the time of the 2006 election "[his] understanding would have been that [owner members] were not eligible to vote." (Williamson Decl. Ex. 3 at 23.) Further, he "assumed that [owner members] would not be on [the voter eligibility] list based upon [his] knowledge of the prohibition that they were not eligible to . . . vote." Id. at 25. Contrary to the Union's argument that allowing owner members to vote had become a custom within the Union, the inclusion of owner members on the eligible voter mailing list was a careless mistake. For this reason, it cannot be characterized as a custom. Therefore, the Union again violated the Act by allowing ineligible owner members to vote.

III.    The Union used its funds to influence the election in violation of the Act.

      A.    The use of union funds to promote a candidate in a union election is impermissible, regardless of the amount.

A union may not use any of its resources to support or oppose a candidate in a union election. Section 401(g) of the Act states: "No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in any election subject to the provisions of this subchapter." 29 U.S.C. § 481(g). There is no *de minimis* exception to this prohibition. In other words, an expenditure of any amount will result in a violation.

> The legislative history of the Act does not indicate that Congress intended to place a limit on the amount that a union might lawfully spend to aid a candidate for office or that it meant to encourage

> troublesome factual disputes over how much (or little) money constitutes a 'de minimis' amount; and the language of the provision itself is unambiguous.  It provides in terms that 'no moneys' of a union shall be spent to promote the candidacy of any person for union office.

Shultz v. Local Union 6799, United Steel Workers of America, AFL-CIO, 426 F.2d 969, 972 (9th Cir. 1970).  This prohibition also applies to in kind expenditures.  The Ninth Circuit stated that the term "'Moneys' as used within § 401(g), has been interpreted as anything of value, whether the expenditure be direct or indirect."  Donovan v. Local Union 70, International Brotherhood of Teamsters, Chauffers, Warehousemen, and Helpers of America, 661 F.2d 1199, 1202 (9th Cir. 1981) (referencing 29 C.F.R. § 452.78).  Therefore, the use of phones, photocopiers, and the time and effort of union personnel may also violate this provision.

B.    The Union used its resources to disseminate the disparaging letter.

Here, the Union received a letter from District Council 36 "terminating the agreement with [the Union] that provided "B List" status to [union] members seeking employment in the geographic jurisdiction of District Council 36."  (Def.'s CSMF at 2.)  "B List" status is important to the Union's membership, with particular importance to unemployed members looking for work outside of the area served by the Union.  However, the letter also blamed Mr. Warhurst, a candidate in the upcoming election, for this loss of status in a manner disparaging to his reputation.

Upon receiving this letter, the Union took several steps to publicize its contents.  Union personnel posted the letter in the referral office, read the letter over the phone, and distributed or discussed the letter at union meetings and job sites.  I agree that it was the Union's obligation to inform its membership of the loss of status.  It was not necessary, however, to communicate the

Findings and Recommendation              10                          {KPR}

information in a manner that laid blame at the feet of a candidate in the upcoming election. The Union used its resources to post, reproduce, distribute and read the letter prior to the upcoming election. The letter was strongly disparaging of Mr. Warhurst, a candidate. For these reasons, the Union is in violation of § 401(g) of the Act and summary judgment in favor of the Secretary should be granted.

IV.     A new election, ordered by the court, is an appropriate remedy of the Union's violations of the Act.

The Supreme Court held that "once a violation of the Act has been proven, a prima facie case that the violation may have affected the outcome has been made." Donovan v. Local Union 70, Int'l Brotherhood of Teamsters, 661 F.2d 1199, 1202 (9th Cir. 1981) (citing Wirtz v. Hotel Employees, Local 6, 391 U.S. 492, 506-07 (1968). However, "[t]he presumption may be rebutted by introducing tangible evidence 'which supports a finding that the violation did not affect the result.'" Id. (citing Wirtz, 391 U.S. at 507).

Here, the court finds three violations of the Act. First, the Union failed to take reasonable efforts to update its mailing list and, as a result, did not send ballots to eligible voting members. This violation foreclosed eleven potential votes. Second, the Union allowed twenty-one owner members, ineligible to vote under the UA Constitution, to vote in the election. Taken together, these two violations amount to thirty-two votes. Third, the Union improperly used union funds to disseminate a letter disparaging a candidate in the election. Although it is impossible to quantify the number of votes this violation may have affected, it bears noting that over 250 union members voted *after* the Union made the disparaging letter public.

In general, if the number of votes separating the candidates is greater than the number of

eligible members who did not vote as a result of the union's election violation, the violation could not "have affected the outcome of the election" and a new election is not authorized by law. 29 U.S.C. § 482. In this case, the top two finishers in the election for union President were separated by only six votes and the top two finishers in the race for union Business Manager were separated by twenty-one votes. Based on the first two violations of the Act, those preventing eligible members from voting and allowing ineligible members to vote, at least thirty-two votes are at issue, enough to affect the outcome of either election.

For this reason, the January 3, 2006 election is void and the court "direct[s] the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization." 29 U.S.C. § 482(c)(2). This election shall apply to the offices of union President and Business Manager.

### CONCLUSION

For the reasons stated, the Secretary's Motion for Summary Judgment (#26) should be GRANTED. Accordingly, the Union's Motion for Summary Judgment (#28) should be DENIED. Plaintiff's request for a new election for the offices of President and Business Manager should be GRANTED.

### SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due no later than December 20, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, any party may file a response within fourteen days after the date the objections are filed. Review of the Findings and Recommendation will go under advisement when

the response is due or filed, whichever date is earlier.

DATED this 5th day of December, 2007.


                                                    /s/ Donald C. Ashmanskas
                                          DONALD C. ASHMANSKAS
                                          United States Magistrate Judge